Okay, Ms. Milner. Good morning, Your Honor. May it please the court. Nora Milner, appearing for petitioners in the case. When we filed a brief, there were five key issues that were presented. However, obviously with complexity and limitations of time, I'd like to focus today on two specific issues. The first being whether it was error for the immigration judge to deny termination of the case based on a lack of jurisdiction. When we filed the case with the court, the Supreme Court had not yet decided the case of Nies Chavez v. Garland. That case builds upon Perea v. Sessions. The motion to terminate that was filed in the case that started with the immigration court itself was based on Perea v. Sessions at the time. The entire area... Isn't your argument simply a jurisdictional argument and not one concerning the aggregation of time? And don't we have clear case law that when that's the only question, the defects don't matter? That's correct, Your Honor. It is stated. Well, we're arguing basically to make sure that the notice to appear is acknowledged as defective in this case and that essentially it was appropriate to terminate jurisdiction in the case to determine that the case should have been terminated for lack of jurisdiction. But the jurisdictional point is covered by our case law as not coming under Karen and Bastida Hernandez is currently on an unbanked petition before our court, right? Correct. Correct, Your Honor. So it's going to be decided one way or another and there's no point in arguing it right now, is there? All right, Your Honor. Then we'll clearly move on to the second issue. The second issue focuses very specifically on credibility. Whether it was error for the immigration judge to determine that the entire lens of this case became one that once the immigration judge heard testimony that petitioner had submitted false information to the port of entry officers and when she was trying to gain admission to be able to file for asylum in the United States, the immigration judge took the position that everything else that petitioner would say thereafter must have been a lie because the immigration judge said on the record that if you would lie at the port of entry to gain admission, then clearly you would falsify any other information after that. Interestingly as well, in the government's response brief, twice they cited or they stated that everything that the petitioner either said in her and wrote in her declaration should be seen through the lens of that issue. This court has held, for example, in the case of Kara V. Ashcroft, that false statements should not be the basis for calling into question an entire claim for asylum, particularly when those false statements are not relevant or related to the asylum claim itself. For example, she failed to disclose that she had lived in the United States for a short period of time, and the fact that her husband was living in the United States, but those don't go to the heart of her asylum claim. Are the cases you cite, were those cases decided before the REAL ID Act? Singh, Gonzalez, let me get the citations for the court. Yes, they, no, was 06, Jammu, Wang was in 03. 03 is before the REAL ID Act. That's correct. So the the issue really is, were those statements made at the port of entry, did they go to the heart of her application? No, that isn't the question, because under the REAL ID Act, that isn't the question. I must say you're not serving your client very well. The question, it seems to me, are two with regard to the emphasis placed on those misstatements. One of them is that she explained that she did it because she was frantically fleeing the country and had already been turned her way at one port of entry and was afraid to say anything that might get her in trouble with the immigration authorities. So it therefore is connected to the line of cases, or arguably so, that say that lies that are told in order to enter the country don't count. And second of all, it was, we have a recent on-bank case, ALAM I think it's called, which basically says you have to look at the whole record and not just a single lie and or a single thing that the IAJ found. And here you have an incredibly reticulated record, a long complicated story, which was completely consistent throughout, as to which the IAJ found no inconsistency as to the story. The only thing he found wrong with it is he thought a piece of it was implausible, which I didn't find very persuasive. But the whole rest of the story, which is unusually complex and so on, he found no problem with. Is that right? That's correct, Your Honor. That's correct. However, when the immigration judge rendered an oral decision and then put it in writing, almost at the very beginning, the immigration judge stated that because Petitioner had submitted false statements at the port of entry upon trying to gain entry, that she would be inclined and I can't remember the exact word, but that essentially she would have no reason not to lie in order to expand her claim to asylum. But then he never actually determined whether she did lie. He didn't look at any of the rest of the testimony to see whether there was some internal contradictions or anything about it, or even commented on its detail, its complexity, its coherence, its internal consistency, or anything like that. That's correct, but the immigration judge also continued to say that because she lied at the port of entry, everything else became, therefore, implausible. Implausible that this happened, implausible that the coroner's decision was separate from the modification of the body. The BIA did not rely on that point. That's correct, but the immigration judge, Your Honor, was clouded by, I think, overly focusing on the false statements that were made at the port of entry. The petitioner did acknowledge, in testimony, that she had lied. She was truthful before the court on that issue. She admitted that she lied on that one point, but weren't there other credibility determinations regarding evidence, contradictory newspaper articles, and the content of those, as opposed to her statement? Yes, Your Honor. The articles were somewhat confusing because they were written, obviously, by a newspaper. The petitioner did attempt to clarify that by stating that her son was known by a nickname, and that she could not explain why there was a discrepancy in the age. But didn't she submit to the court that her son was, in fact, died at the time she said he did? That's correct, she did, Your Honor, she did. It went beyond that, though. It included his uncle, who was also killed, right? That's correct, Your Honor, who was murdered as well. And with the correct name and date of birth and all of that. That's correct. That was exactly correct. One of the other adverse comments that, I believe, the immigration judge focused on was whether her son, Libney, stated that they had stayed in Rosarito or Tijuana. He attempted to explain that in cross, that he was not familiar with the area, and he thought that Rosarito and Tijuana were essentially the same area. He also said that they stayed in a church, but he didn't say they stayed in a church. That's correct. There was an issue as to whether he had said they'd stayed in a church. So those, however, become what we call somewhat cumulative minor inconsistencies. And the question is, did he say that he stayed in a church? He just said he went to a church, but he didn't say he stayed. He didn't say he slept in a church. That's correct. He said they went to a church in terms of how long and exactly where that church was. We argue to the court, really, that that is really a minor inconsistency that doesn't, again, go to the heart of the claim. The heart of the claim standard doesn't apply, so let's get off that one. Okay. Well, Your Honor, focusing then on the adverse credibility issues, we believe that the Immigration Court was unduly influenced by the statements made at the Court of Entry, and in that sense, they took a very jauntous view of just about every other evidence that petitioner presented. Okay. Your time is up. We'll give you a minute. Thank you very much. All right. Ms. Watson. May it please the Court, Your Honors, Joanna Watson, on behalf of the United States Attorney General. Petitioners focused on the adverse credibility determination, and I want to explain that here, there were actually three independent dispositive grounds for denying the petitioner's claim. We have an adverse credibility determination, and I'll get more to this later, but there were four factors, and only one of those factors was actually challenged. Therefore, three of those factors were waived. There's also a determination that petitioner didn't establish. But does it use the phrase unwilling or unable? I believe the immigration judge did, because he goes on to a lengthy of all that they were doing in order to try to find her son and find the people who took him. I have never heard that there was an unable or unwilling finding here. Was there a country report referenced in there? The agency did not reference the country report. Okay. But I know I'm going way over time. That's okay, but I really, I don't see an unable or, I'm looking at the IJ opinion, and it talks about the credibility is that she indicates that she reported to the Human Rights Commission, but I don't see any unable or unwilling finding. If you find one, you can send us a note, but I couldn't find it. Was there anything about, was there a torture, a finding of likelihood of torture? There was a finding, there was a finding of no likelihood of torture. And getting to that with the torture as well, and it also goes to her fear, her sister has remained on the property, unharmed. She's made some vague comments about threats that she's received, and she tried to downplay that her sister wasn't involved in any of the investigations, but her sister's named in all of the reports, went with her, and filed reports and everything, and she remains unharmed. And the only, you know, we have this vague threat that she received in Tijuana, and we have the response from the AG showing all the steps that they had taken. And it's, there's nothing that compels the conclusion that that the government would acquiesce to her torture in this instance. Okay, thank you very much, you're way over your time. All right, thank you. And Ms. Milner, you can have one minute, please. Thank you, Your Honor. Your Honor, the ultimate issue has been very well explained today, is the credibility issue in this matter. One of the questions that's often asked, and almost always asked by two asylee applicants is, did you go to the police? Did you attempt to secure assistance from the government? And in this case, it's very obvious that Petitioner not only went to the police, she went to every door that she could knock on, including the governor of another state, seeking assistance to find who murdered her son, and how she could get help. Well, in fact, while she was there, it wasn't who murdered her son, it was trying to find her son. That's correct. She knocked on every door that she could possibly find. She was at some point then advised, even by the Human Rights Commission, that you're not safe, and that you should leave. She did relocate to Tijuana. The issue of whether the telephone call is vague, that's a very difficult position to take, because when someone calls you after you've been threatened and told to leave the particular area, and not long thereafter, you receive a phone call telling you that you're being watched, and you're not safe, I think it would be logical to assume that your life is in danger. Where we really believe that Petitioner has presented clear evidence of the nexus to her case, to her particular social group, and we would ask the court to... Okay, thank you very much. The case of Paris-Santa Cruz is submitted. Paris-Santa Cruz v. Garland is submitted.
judges: BERZON, RAWLINSON, Antoon